DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
            v.                  )    Criminal No. 2012-35
                                )
DAVID HADDOW,                   )
                                )
            Defendant.          )
_____  )


ATTORNEYS:

**Bryan Foreman, Esq., USA**
United States Attorney's Office
St. Croix, VI
**Ronald Sharpe, Esq., USA**
United States Attorney's Office
St. Thomas, VI
    *For the United States of America,*

**Treston E. Moore, Esq.**
Moore, Dodson & Russell, P.C.
St. Thomas, VI
    *For David J. Haddow.*


<u>**MEMORANDUM OPINION**</u>

**GÓMEZ, J.**

    Before the Court is the motion of David J. Haddow

("Haddow") for a judgment of acquittal[1] pursuant to Rule 29 of

---

[1] Haddow first filed his motion for a judgment of acquittal on July 22, 2013. Thereafter, on July 26, 2013, he refiled his motion with points and authorities as to the issue of identification. On the Court's instruction to address the identity issue, Haddow filed the amended motion addressed herein.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 2

the Federal Rules of Criminal Procedure. Haddow asserts that the government failed to identify him as the David Haddow named in the indictment.

The issue presented here merits special attention. The Court must decide the question of the quantum and quality of circumstantial evidence that is sufficient to permit a jury to infer that a defendant has been identified.

## I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Hansel Bailey ("Bailey") managed Compass Diversified ("Compass"), a business incorporated in the U.S. Virgin Islands in 2004. Compass was a business management and consulting firm. Compass marketed a tax plan that would allow its clients in California to claim business deductions on their income tax returns by making payments to Compass. The scheme consisted of a three-stage money flow. First, Compass clients would make payments to Compass. A Compass employee would deposit that money into Compass's bank account. Second, a Compass employee would transfer a portion of the money in Compass's account by check to another bank account controlled by a Compass employee and held in the employee's name. Finally, Compass would return money from the employee's account to the Compass clients.

Bailey recruited Dwight Padilla, a tax preparer with existing tax clients, to recruit those existing tax clients to

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 3

work with Compass. Bailey also hired David Haddow ("Haddow") to
be the chief operations officer of Compass, who would run the
business.

Haddow recommended that Bailey hire Laura Cates ("Cates")
as a consultant. Haddow collected money from Compass clients and
gave it to Jeanna Boschulte ("Boschulte"), an employee of
Compass. Boschulte then returned the money to the clients who
sent it to Compass. Jason Questel ("Questel") was the accountant
for Compass. Jennifer Skipper was also employed as a junior
consultant at Compass. In 2006, five employees worked for
Compass at its location in Buccaneer Mall on Saint Thomas,
United States Virgin Islands: Haddow, Cates, Boschulte, Questel,
and Skipper.

To promote the economic development of the Virgin Islands,
the Virgin Islands provides a tax credit for qualifying Virgin
Islands businesses. *See generally* V.I. CODE ANN. tit. 29, § 701. A
company may be eligible for this tax credit when it meets
certain requirements, such as employing a minimum number of
Virgin Islands residents, providing delineated products or
services, and investing a minimum of $100,000 in the qualifying
business. *See* V.I. CODE ANN. 29, § 708. That tax incentive program
is referred to as the "economic development commission program,"
or "EDC program." Compass Diversified claimed an economic

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 4

development tax credit in tax year 2004 in the amount of

$213,000. Compass Diversified claimed an economic development

tax credit in tax year 2005 in the amount of $700,000.

Compass closed in October, 2007.

On December 6, 2012, a grand jury returned a two-count

indictment against defendants Hansel Bailey ("Bailey") and David

Haddow ("Haddow")(collectively, "the defendants"). The

Indictment alleges that, among other things: (1) the defendants

conspired to defraud the United States for the purpose of

defeating the Internal Revenue Service in the computation and

collection of taxes, in violation of 18 U.S.C. § 371; and (2)

the defendants conspired to evade a large part of the income tax

due and owing to the United States Virgin Islands, in violation

of 33 V.I.C. § 1522.

On December 17, 2012, Attorney Treston Moore entered his

appearance on behalf of Haddow.

Trial began on July 8, 2013. On that date, after the jury

panel was sworn, Attorney Moore, introduced himself and his

client to the jury.

> MR. MOORE: Good morning, ladies and gentlemen.
> My name is Treston Moore. I'm from the law firm of
> Moore, Dodson and Russell. My partners are J. Daryl
> Dodson and Charles Steve Russell. And this is my
> client, Mr. David J. Haddow.

July 8, 2013, Trial Tr. at 9-10.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 5

    In his opening statement, Attorney Moore referred to Haddow

as "my client":

> MR. MOORE: Good morning, ladies and gentlemen of the jury,
> co-counsel, my client, and co-defense counsel. Ladies and
> gentlemen, I've introduced myself previously. I'm Treston
> Moore. I am entirely honored to represent my client, Mr.
> David Haddow. . . .

July 8, 2013, Trial Tr. at 75.

    The government presented testimony from thirteen witnesses.

The first, Jeanna Boschulte, was employed by Compass as a

community outreach coordinator/gifter. (July 8, 2013, Trial Tr.

at 88.) Boschulte testified that her job was to go out in the

community to see what nonprofit organizations, such as the Boys

and Girls Club, schools, or a Little League team, might have

need for monetary donations. Boschulte identified approximately

three or four worthy organizations. Bailey and Haddow responded

that they would be able to make a monetary donation to those

organizations at a later date. No donation was ever made to a

charitable organization that Boschulte identified.

    Boschulte also testified that she opened a FirstBank

account at Compass's direction in her own name, ostensibly for

the purpose of making donations to charitable organizations from

Compass. Boschulte would receive a check made out to her from

the Company. She would then deposit that check into her

FirstBank account. These deposits included a $57,500 check dated

November 30, 2005, and a $55,100 check dated on or about

December 14, 2005. (Trial Tr. at 105-108.) Boschulte testified

that she would wait for the check to clear, then notify Haddow

and Bailey. Then she would receive further instructions.

Specifically, Haddow or Questel would give Boschulte information

about an individual and the amount to be transferred. Boschulte

would then go to the bank and wire the money to that individual.

Boschulte would then create a receipt for a wire transfer.

Subsequently, Boschulte testified that she was directed to open

another bank account in her name for Compass at Scotia Bank.

At no time during Boschulte's testimony was she asked to

identify David Haddow.

The second witness, Jack D'Angelo, owns a business that

invested in Compass. (July 8, 2013, Trial Tr. at 214.)  D'Angelo

testified that Padilla, his tax preparer, introduced him to

Bailey.  D'Angelo testified that he did not recall any

conversations with Bailey about Compass's services. D'Angelo

testified that a person from Compass asked him for $120,000, but

does not remember the name of that person. At no time during

D'Angelo's testimony was he asked to identify David Haddow, nor

did D'Angelo refer to Haddow.

The third witness, Percival Clouden, testified that he has

been the chief executive officer, sometimes called the executive

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 7

director, at the Economic Development Authority, since 2007.
(July 8, 2013, Trial Tr. at 255.) Clouden further testified that
he oversees the Economic Development Commission ("EDC"). Clouden
testified that the EDC invites companies to do business in the
territory under the tax incentive program. Clouden testified as
to the steps in the tax incentive program application process.
Clouden testified that there is "frequent communication" between
the applicant and the EDC. Clouden testified that he was not
with the Economic Development Agency as of 2004. Clouden did not
personally research Compass. Clouden testified that Compass was
committed to contribute $50,000 each year into the local
community, with a 5% increase each year. Additionally, Compass
was committed to allocate $25,000 to an employee to monitor
those contributions. At no time during Clouden's testimony was
he asked to identify David Haddow.

The fourth witness, Marcella Sommersall, testified that she
is a disclosure officer at the Government of the Virgin Islands,
Internal Revenue Bureau. (July 9, 2013, Trial. Tr. at 5.)
Sommersall testified that she reviewed the tax returns Compass
filed. Somersall further testified that she did not find
Compass's name on the list of applicants who had been granted
the tax credit benefits.  Somersall also testified that she did
not find a certificate for the credit Compass had taken.

Somersall testified that David J. Haddow's signature appeared on several documents. At no time during Somersall's testimony was she asked to identify David Haddow.

The fifth witness, Jason Questel, testified that he began working at Compass in February, 2006, as an accountant. (July 9, 2013, Trial. Tr. at 31.) Questel testified that he learned about the position at Compass from an individual he referred to as "Mr. Haddow." (July 9, Trial Tr. 31:16.) Questel stated that "Mr. Haddow" and "Mr. Bailey" interviewed him for the job at Compass. (*Id.* 32:9-12.) Questel described the gift program, Compass's various bank accounts, Compass's oil and gas venture investment, and Questel's job responsibilities as accountant. Questel explained that the checks going out from Compass were signed by Haddow. Questel testified that he discussed the circular flow of funds with Haddow. Questel subsequently testified that he talked to Haddow to properly account for client activity. Questel further testified that certain invoicing did not match payments received, and brought this concern to Haddow's attention. Questel also testified that he attended a meeting with Haddow in 2006 on St. Thomas to review client invoices. Quested further testified as to a conference call with Haddow and Padilla. Accounting spreadsheets and documents tracking client activity were admitted into evidence.

At no time during Questel's testimony was he asked to identify David Haddow.

The sixth witness, Laura Cates ("Cates"), testified that she was a Virgin Islands employee of Compass. She began her employment in November, 2005. (July 9, 2013, Trial. Tr. at 114.). Cates testified that she interviewed twice with someone she referred to as "Dave Haddow" before beginning employment. (July 9, 2013, Trial Tr. 116:4.) Cates testified as to her job responsibilities. Cates testified that "Dave and I would spend a lot of time researching or vetting [projects]." (July 9, 2013, Trial. Tr. 123:11-13.) When asked who was involved in evaluating ideas, Cates answered "Dave and I." (July 9, 2013, Trial. Tr. 124:18.)

On cross-examination, Attorney Moore introduced himself to Cates:

A. Good afternoon.

Q. I'm Treston Moore. I spoke with you. But I represent David Haddow.

(July 9, 2013, Trial Tr. 131:24-25, 132:1).

Attorney Moore showed Cates Defendant's Exhibit 68. Cates identified the document as a newsletter from the summer of 2006 sent by Compass Diversified to its clients. (July 9, 2013, Trial Tr. 141:2-14.) Attorney Moore then moved Defendant's Exhibit 68 into evidence. Subsequently, Cates stated that she "helped Dave"

to arrange negotiations and phone calls. (July 9, 2013, Trial Tr. at 156.) At no time during Cates's testimony was she asked to identify David Haddow.

The seventh witness, Anastasia Howard, is a real estate agent and was a client of Padilla. (July 9, 2013, Trial Tr. at 164.) Padilla referred Howard to Compass as a tax savings plan. Howard ultimately invested in Compass. Howard testified that someone she referred to as "Dave Haddow" contacted her "via e-mail and telephone" to go over payments and wiring instructions. (July 9, 2013, Trial Tr. 169:4-5.) An invoice from Compass to Howard was admitted into evidence. Howard testified that Haddow made phone calls to press for dates to commit to making payments. Howard further testified about e-mails from Haddow. Howard stated that she had never met Haddow in person. At no time during Howard's testimony was she asked to identify David Haddow.

The eighth witness, Brian Faris, testified that he was previously a realtor and a client of Padilla. (July 9, 2013, Trial Tr. at 212-213.) Padilla presented Compass to Faris as a way to reduce tax liability. Faris decided to use the services of Compass. Faris testified that he received a number of e-mails from an individual he referred to as "David Haddow." (Id.

216:11-14.) At no time during Faris's testimony was he asked to identify David Haddow.

The ninth witness, Victoria O'Brien, is a court witness coordinator for the Internal Revenue Service. (July 9, 2013, Trial. Tr. at 240.) O'Brien testified about IRS records. At no time during O'Brien's testimony was she asked to identify David Haddow.

The tenth witness, Dwight Padilla, was a tax preparer who worked at Compass. (July 9, 2013, Trial. Tr. at 261; July 10, 2013, Trial Tr. at 4.) Padilla testified that he knew a person by the name of David Haddow:

> Q. Are you familiar with an individual by the name of David Haddow?
> A. Yes, I am.
> Q. And who is Mr. Haddow?
> A. Mr. Haddow was an employee of Compass Diversified.

(July 9, 2013, Trial. Tr. at 328:14-18.) Padilla further testified to conversations he and Haddow had, as well as to meetings with the Compass staff in the Virgin Islands. At no time during Padilla's testimony was he asked to identify David Haddow.

The eleventh witness, Bernhard Braunwalder, testified that he is involved in a fire protection business. (July 10, 2013, Trial Tr. at 77.) Padilla introduced Braunwalder to Bailey for investment purposes in 1998. Braunwalder heard about Compass

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 12

from Bailey and Padilla. Padilla recommended seeking a tax break

by investing in a Virgin Islands business. Braunwalder testified

as to the mechanics of his dealings with Compass. At no time

during Braunwalder's testimony was he asked to identify David

Haddow.

The twelfth witness, Timothy Adkins, testified that he

hired Compass for consulting services (July 10, 2013, Trial Tr.

at 98.). Bailey introduced Adkins to Padilla. Bailey lent money

to Bailey at the end of 2006. At no time during Adkins's

testimony was he asked to identify David Haddow.

The thirteenth and final witness, Richard Sherman, and his

wife operate a therapy treatment business. (July 10, 2013, Trial

Tr. at 186.) Sherman testified that he and his wife tried to

obtain consulting services for their therapy business from

Compass. At no time during Sherman's testimony was he asked to

identify David Haddow.

At the close of the Government's case-in-chief, Haddow

moved for a judgment of acquittal. Haddow alleged that the

government failed to identify the Haddow seated in the courtroom

as the Haddow who allegedly committed the offenses. (July 10,

2013, Trial Tr. at 212-68.) The Government conceded that there

was no direct evidence identifying Haddow. The Court took the

motion under advisement, noting that there appeared to be no circumstantial evidence identifying Haddow.

The defendants did not present any evidence or witnesses.

In his closing statement, Attorney Moore again referred to his client: "It's been my honor to represent Mr. Haddow throughout this ordeal." July 11, 2013, Trial Tr. at 51.

On July 11, 2013, the jury convicted Haddow of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and one count of conspiracy to evade or defeat tax in violation of 33 V.I.C. § 1522.

## II. <u>DISCUSSION</u>

A judgment of acquittal is appropriate under Rule 29 if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'")(quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) ("Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the fact finders was permissible.").

The government may sustain its burden entirely through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988). A motion for acquittal should be granted when there is a "total absence of evidence that [the] defendant had any connection" with the crimes alleged and proved. *United States v. Darrell*, 629 F. 2d 1089, 1091 (5th Cir. 1980) (conviction reversed with directions to enter judgment of acquittal in mail fraud case, noting there was little Fifth Circuit precedent saying what evidence would permit an inference of the defendant's identity).

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 15

## III. ANALYSIS

Viewing the evidence in the light most favorable to the government, the Court must determine whether any rational jury could find beyond a reasonable doubt that the Haddow seated in the courtroom was the same Haddow named in the indictment. Unless the defendant chooses to admit participation in the act, identification is an element which the government must prove beyond a reasonable doubt. *United States v. Wilford*, 493 F.2d 730, 735 fn. 9 (3d Cir. 1974). "A witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." *United States v. Taylor,* 900 F.2d 779, 782 (4th Cir. 1990).

This case thus presents this Court with the issue of whether the evidence in this case is sufficient to permit the inference that the person on trial was the person who committed the crime. In order to answer that question, the Court must assess the information from which a jury may draw permissible inferences.

There is no consensus in the caselaw that delineates or defines the essential elements, including the quantum and quality of circumstantial evidence, that must be satisfied to permit a jury to infer that the person on trial was the person

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 16

who committed the crime. Instead, the several federal appellate courts that have addressed this issue have generally employed an approach similar to a "totality of the circumstances" test. *See, e.g., United States v. Ayala*, 289 F.3d 16 (1st Cir. 2002); *United States v. Bell*, 166 F.3d 1201 (2d Cir. 1998)(unpublished); *United States v. Tate*, 163 F.3d 600 (4th Cir. 1998); *United States v. Vahalik*, 606 F.2d 99 (5th Cir. 1979); *United States v. Weed*, 689 F.2d 752 (7th Cir. 1982); *United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995); *United States v. Chambliss*, 267 F. App'x 870 (11th Cir. 2008). As a result, the judicial landscape does not seem uniform as circuit courts seem to differ in deciding which information may be used in determining if sufficient circumstantial evidence as to a defendant's identity was produced.

At least one circuit focused entirely on the defendant's behavior. In *Butler v. United States*, defendants Dodson Benedec, Sidney L. Schwarz, Robert Eakins, Leonard Ostrowsky, Jerome Stadin and Peter J. Wangberg (collectively, "the Benedec defendants") and eleven other defendants stood trial for mail fraud. *Butler v. United States*, 317 F.2d 249, 252 (8th Cir. 1963). At trial, the Benedec defendants' lawyer identified Eakins and Wangberg in his opening statement. *Id.* at 254. One witness under cross-examination identified Stadin. *Id.* None of

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 17

the other Benedec defendants were directly identified. *Id.* At no point during the trial did the defendants or their lawyers make the question of identity an issue.   *Id.*   Raising identity as an issue for the first time on appeal, the Benedec defendants claimed the government failed to connect their names with the corporeal defendants on trial. *See id.* at 254. The Eighth Circuit held that the defendants "tacitly admitted their identity" in light of all the facts and circumstances, including the defense put on by the defendants. *Id.* at 254-255. The Court stated that "[i]t is inconceivable that these [Benedec defendants], individually or collectively, would have sat mute and subjected themselves to the ordeals of the lengthy trial if they had sincerely and in good faith believed they were being tried for an offense with which they were completely disassociated." *Id.*

Although the Eighth Circuit considered the defendant's failure to object and submission to trial as evidence of identity, *see Butler*, 317 F.2d at 254,[2] the Court is troubled by this approach.  The Fifth Amendment protects a defendant's right to remain silent. U.S. Const. amend. V.  It is axiomatic that a criminal defendant is under no obligation to put on any defense

_____
[2] Although the Court recognizes that this case was decided in 1963, before the Supreme Court of the United States issued its opinion in *Griffin*, it has not been explicitly overruled.

at all. *See, e.g.*, *Griffin v. California*, 380 U.S. 609, 615
(1965)("[T]he Fifth Amendment . . . forbids either comment by
the prosecution on the accused's silence or instructions by the
court that such silence is evidence of guilt.") This Court finds
that *Butler*'s approach is wholly inconsistent with that
principle. Accordingly, this Court chooses not to follow *Butler*.

Other courts have determined that counsel's use of the term
"defendant" during an examination, in conjunction with other
evidence, was sufficient circumstantial evidence from which a
jury could infer identity.

In *United States v. Weed*, 689 F.2d 752 (7th Cir. 1982),
John Weed and his brother Leonard Weed were required to complete
a customs form upon entry into the United States. *Weed*, 689 F.2d
at 753-54. They were indicted after failing to declare certain
amounts of currency on their customs form. *Id.* At trial, three
government customs agents testified regarding statements John
Weed ("Weed") made the day he had entered the United States. *Id.*
at 754. The agents also testified regarding their search of
Weed's luggage. *Id.* In the course of taking testimony, counsel
for both the government and the defendant used Weed's name and
"the defendant" interchangeably.  *Id.* Defense counsel did not
object to the prosecution's references to Weed as "the
defendant." *Id.* No direct identification occurred at trial. *Id.*

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 19

at 755.  At the conclusion of the evidence, Weed moved for a
judgment of acquittal. *Id.*  He was convicted at the trial court,
and appealed to the Seventh Circuit. *Id.* at 754.

The Seventh Circuit noted that no direct identification had
occurred. *Weed*, 689 F.2d at 754. At the same time, the Court
held that identification could be inferred from all the facts
and circumstances that were in evidence. *Id.* The Court
specifically noted that none of the witnesses during trial had
noted that the defendant was not the same Weed stopped by them
on the day at issue. *Id.* at 755.  The Court also took note of
the fact that both the prosecution and the defense referred to
the defendant on trial as John Weed, and that the defense never
objected to the prosecution's references to "the defendant." *Id.*
After considering the unobjected to interchangeable use of
Weed's name and "the defendant" and the witnesses' failure to
indicate Weed was not the man arrested, the *Weed* Court found
that there was sufficient evidence to prove identity. *Id.* at
757.

Intuitively, the approach taken in *Weed* is logically
sustainable.  The prosecutor referred to the individual engaged
in the acts alleged in the indictment as "the defendant" and
"John Weed." *Id.* at 754. In the course of their testimony, the
witnesses in *Weed* referred to the John Weed named in the

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 20

indictment as "the defendant." *Id.* When an attorney first uses
the term, "the defendant," in a question where no witness has
identified the defendant, she makes a presumption about
identity. That is, the attorney injects the otherwise
unconnected and unidentified defendant in the courtroom into the
subject or object of the inquiry. In context, the witness who
responds to a question about "the defendant" necessarily lends
relevance to, and acceptance of, the term "defendant." In doing
so, the witness ties a person in the courtroom – "the defendant"
– to the individual and conduct about which and whom that
witness is testifying.

　　Still other courts have determined that competent evidence
– such as witness testimony and physical exhibits admitted into
evidence – is sufficient to infer identity. For example, in
*United States v. Ayala*, 289 F.3d 16 (1st Cir. 2002), Rafael
Ayala-Ayala ("Ayala"), Armando Torres-Ortiz ("Ortiz"), and
others were tried for entering a military installation for a
purpose prohibited by law. In that case, a police officer
testified that he had detained the individuals named in the
indictment. *Id.* at 25. The prosecutor had the officer look at
photographs of the individuals who were alleged to have been
detained the night of the incident. *Id.* The officer stated that
he recognized the photographs, two of which were of Ortiz and

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 21

Ayala respectively, as the photographs had been taken the night of the incident in his presence. *Id.* The Court admitted the photographs into evidence. *Id.* The United States failed to directly identify Ortiz and Ayala at trial. *See id.*, 289 F.3d at 25. Thereafter, Ayala and Ortiz filed Rule 29 motions, arguing that there was insufficient evidence to support a finding that they were the individuals detained on the night in question. *Id.* The district court ruled that the identification was sufficient, finding that in-court identification was not required as long as there was evidence in the record showing that the person arrested was the person being accused. *See Ayala*, 289 F.3d at 25.

On appeal, the First Circuit found that the evidence adduced at trial was sufficient for identification purposes. *Id.* Specifically, the Court considered that: the officer testified that the individuals arrested on the night in question were those in the photographs; the photographs were entered in evidence; and counsel for Ayala and Ortiz indicated to the Court that "she was appearing on behalf of [Ortiz] and [Ayala]." *Id.*[3]

---

[3] This Court notes that the fact-pattern seen in *Ayala* correlates with the evidence adduced as against Hansel Bailey, Haddow's co-defendant. Here, the Court admitted Exhibit 68, a pamphlet produced by Compass Diversified. That pamphlet had a picture of Bailey with his name in a caption below.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 22

This approach is logically sound. The trier-of-fact may certainly consider all things entered into evidence and draw inferences therefrom. Thus, in *Ayala*, the Court could have looked at the pictures of the individuals detained the night of the incident, compared them to Ayala and Ortiz, and reasonably concluded that two of the pictures depicted Ayala and Ortiz.[4]

The Court is persuaded that the appropriate approach to determine whether sufficient evidence exists for a jury to inter that David Haddow was identified is one that draws on the logical and contextual considerations endorsed in *Weed*. That approach also is implicitly underpinned by the well-established tenet that a jury may "make any reasonable inferences that can be drawn from the evidence." *United States v. Elwell*, 515 F. App'x 155, 163 (3d Cir. 2013). At its core, in the absence of any direct evidence, the issue before the Court is whether the utterances of counsel may permissibly be considered as part of the circumstantial evidence from which a jury may infer identity. That question requires some deliberation, as it is one of first impression for this Court.

There are two broad categories of such utterances. The first occurs when counsel argues or makes statements directly to the Court or jury. The second occurs when counsel examines a

---

[4] *Ayala* was a bench trial. As such, the trial judge acted as the trier-of-fact.

witness. It is clear that statements and "arguments of counsel
are simply not evidence." *United States v. Sandini*, 888 F.2d
300, 311 (3d Cir. 1989). What is less clear is how to treat the
second category of utterances.  That is, those that prompt a
witness's related response.  The Court currently is unaware of
any authority in the Third Circuit that directly addresses this
issue.  Even so, there are certain axioms that guide the Court
in its treatment of such utterances. First, counsel's
statements, such as questions on direct or cross-examination,
are not made in a vacuum.  Those questions are posed to
witnesses, who may answer in any manner which is responsive to
the question. In doing so, those witnesses provide competent
evidence.  The meaning and weight of such evidence is determined
by the jury, as the jury is the ultimate judge of witness
credibility and the trier of fact.  *See United States v.
Scheffer*, 523 U.S. 303, 336 (1998) (discussing the role of the
jury).  Thus, it is clear that counsel's predicate questions are
considered by, and generate competent evidence from, a witness.

The Court must still determine what, if any, permissible
evidentiary value is added by the utterances of counsel that
occur when counsel questions a witness. The evidentiary value of
such utterances is perhaps best demonstrated with a brief

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 24

discussion of the manner in which evidence is adduced during cross-examination.

During cross-examination, an attorney may ask leading questions. Fed. R. Evid. 611. The use of leading questions, as permitted by the Federal Rules of Evidence, in essence allows a cross-examining attorney to testify, subject only to the witness's agreement or objection. *See, e.g.*, *Stine v. Marathon Oil Co.*, 976 F.2d 254, 266, 24 Fed. R. Evid. Serv. 78 (5th Cir. 1992)("As we all are fully aware, any good trial advocate who is allowed leading questions can both testify for the witness and argue the client's case by the use of leading questions.") Leading questions are those questions which suggest the sought-after answer. Typically, in response, a witness need only say "yes" or "no." By answering the question, the witness does not necessarily indicate acceptance of the premise. However, by answering the question without objecting to its elemental underpinnings – such as the subject or object of the sentence – the witness adopts, at least, those elemental components of counsel's questions. Those elemental components, such as the subject or object of the sentence, necessarily and contextually become part of that witness's testimony.

Context is defined as the weaving together of words in a language to give them meaning. *See* Context, *Webster's Third New*

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 25

*Int'l Dictionary* (Merriam Webster 1993). Context is derived from the interrelated conditions in which something exists or occurs. *Id*. A witness's "yes" or "no" response is given meaning by incorporating the contextual nest from which it was born. Were this Court to hold otherwise, the witness's answers would no longer be relevant, as a long list of "yes"es and "no"s without context does not tend to prove or disprove any material fact. *See* Fed. R. Evid. 401 (relevance).  Linguistically, such an exchange would have little or no meaning.

The words used by counsel in their questions cannot be thought of as having meaning completely independent of the context in which those questions are asked.  It would defy logic to find that jurors do not determine what the words in questions mean or refer to based on context.[5]

As such, the Court is persuaded that in considering the evidence, a jury may draw inferences from both the content of counsel's questions and the context which may give meaning to those questions.

---

[5] Other courts have found so as well, though without explicitly explaining why.  *See, e.g., Weed*, 689 F.2d at 754 (finding that interchangeable use of "the defendant," an individual assumed to be in the courtroom, and the name "John Weed" the name in the indictment, was circumstantial evidence that "the defendant" and "John Weed" were the same individual and the one witnesses were being questioned about.)

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 26

Here, Attorney Treston Moore introduced himself as counsel for David Haddow.  In that capacity, he engaged in cross-examination of several witnesses.  One such witness was Laura Cates ("Cates").  Attorney Moore introduced himself to Cates by stating: "I'm Treston Moore. I spoke with you. But I represent David Haddow." (July 9, 2013, Tr. 131:24-25, 132:1).  A jury could reasonably infer that the individual Attorney Moore was referring to was the individual he had been conferring with and sitting near during trial.  The jury could therefore conclude that when Attorney Moore referred to "David Haddow," as his client, that was the individual he was discussing.

After introducing himself to Cates, Attorney Moore began cross-examination.  During the course of his cross-exam, the following exchange took place:

Q [Attorney Moore]. Did you take the documents to Mr. Haddow?

A [Laura Cates]. I don't, I don't recall.

Q. Do you recall whether or not Mr. Haddow signed them?

A. No, he did not.

Q. And do you recall why he didn't sign them?

MR. FOREMAN: Objection.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 27

THE COURT: Sustained.

BY MR. MOORE:

Q. What, if anything, did you do with regard to the
tax returns after Mr. Haddow did not sign them?

(July 9, 2013, Tr. 149:4-14).  Cates's responses to Attorney

Moore's questions did not alter the essential elements of them.

That is, her response to those questions incorporated the

essential elements of the questions – for example, the object

(David Haddow) – into her answer.

From this exchange, it could be reasonably inferred that,

as before, the "David Haddow" to which Attorney Moore was

referring was the man at counsel's table.  In answering Attorney

Moore's questions, Cates incorporated them into her testimony.

The line of questioning dealt specifically with the behavior

alleged to be criminal in the indictment.  Thus, this cross-

examination created a link between the individual sitting in the

courtroom and the individual named in the indictment.

Futhermore, at the beginning of trial, in his opening

statement, Attorney Moore stated, "I'm Treston Moore.  I am

entirely honored to represent my client, Mr. David Haddow."

(July 7, 2013, Trial Tr., 75:6-7.)  This statement alone is not

evidence.  It does, though, create a link between the "client" –

reasonably assumed to be the individual in communication with

the attorney during trial – and the name "David Haddow."  That

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 28

is, this introduction creates a sort of dictionary in which the

generalized name "David Haddow" is interchangeable with

"Attorney Moore's client."

Thereafter, the name "David Haddow," and variations

thereof, was used repeatedly by Attorney Moore in the course of

cross-examining the Government's witnesses.  During his cross-

examination of Boschulte, Attorney Moore asked, "With regard to

the work that you observed Mr. Haddow doing there, would you say

it was a small or large amount of time?" (July 8, 2013, Trial

Tr. 205.) Boschulte responded "Oh, the work that Mr. Haddow did?

. . . A lot of the time." (*Id.*)

Also during the cross-examination, the following exchange

occurred:

> Q [Attorney Moore]. In a couple of the transactions that we
> referenced, you noted that you would receive instructions
> from either Mr. Haddow or Mr. Padilla, is that correct?
>
> A [Boschulte]. Mr. Haddow or Mr. Questel.

(July 8, 2013, Trial Tr. 206). Boschulte thus adopted the

essential elements of the question – that is "Mr. Haddow" as

either the object or subject - into her answer.  By testifying

as to the actions taken by "Mr. Haddow," the witness linked the

"Haddow," as defined by Attorney Moore, to the person and

related conduct about which the witness testified.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 29


Another witness, Questel, was asked by Attorney Moore if he had been recommended by "Mr. Haddow" for the position at Compass Diversified. (July 9, 2013, Tr. 73.) Questel responded "Yes." (*Id.*) Attorney Moore also inquired if "Mr. Haddow" had made approvals of certain programs. (*Id*. at 77.) Questal responded that "Mr. Haddow" had bought the program. (*Id*.) As before, these answers incorporated into them not only the object or subject of the question, "Mr. Haddow," but also the context which gave it meaning. The definition of "Mr. Haddow" as "Attorney Moore's client," linked the David Haddow in court to the person and related conduct about which the witness testified.

Finally, during his cross-examination of Padilla, Attorney Moore asked, "In Bailey 149, you sent to Mr. Haddow, October 10th 2006, a document for Mr. L-e-h-r, and you wanted this invoice to him to be dated December 15th, 2005, correct?"  Padilla answered, "Correct." (July 10, 2013, Trial Tr. 54:20-23.) Again, the witness adopted Attorney Moore's question, including its object of "Mr. Haddow," and connected it to the individual charged in the indictment.

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 30

## IV. <u>CONCLUSION</u>

"Words are but symbols for the relations of things to one another and to us[.]" Friedrich Nietzsche, *Philosophy in the Tragic Age of the Greeks*. The interrelatedness of words and the significance of context is not lost when a lawyer, using the English lexicon, examines a witness in Court. Indeed, it would be error to find that the words that give context to an attorney's question must be ignored. It would similarly be error to find that those words do not contribute to the circumstantial evidence adduced from a witness's answer. Thus, an attorney's utterances to a witness may be considered as part of the circumstantial evidence that a jury may consider in determining if the government has met its burden of proof.

Considering the total quantum and quality of the oral circumstantial evidence adduced at trial, and viewing the evidence in a light most favorable to the government, the Court finds it cannot grant the relief Haddow seeks.

Indeed, despite the Government's utter failure to provide any direct evidence of identity, there was not a complete absence of evidence.  To the contrary, there were several pieces of circumstantial evidence that the David Haddow in the courtroom was the same David Haddow alleged to have committed

*United States v. Haddow*
Criminal No. 2012-35
Memo. Op.
Page 31

the offenses charged. The Court finds that a rational jury could

find proof of Haddow's guilt beyond a reasonable doubt.[6]

                              S\ _____
                                    **Curtis V. Gómez**
                                    **District Judge**

---

[6] While the Court finds that Rule 29 relief is not appropriate, the identity issue that arose in this case warrants a brief comment. It is well established that the identity of the defendant is an important facet of proving any crime.  Given the consequences of a criminal proceeding, even the identity of witnesses against the accused is of paramount importance. In fact, this Court has previously addressed the grave importance of ensuring the identity of those testifying in a trial.

In *United States v. Edwards*, CRIM. 2010-36, 2011 WL 5834241 (D.V.I. Nov. 18, 2011) the government proffered a witness who purported to be "Troy Willock." In fact, that witness used not only a name, but also a birthdate and social security number that belonged to another individual. Id. The failure to discover and disclose the uncertainty surrounding "Troy Willock's" identity deprived the defense of an opportunity to investigate, pre-trial, a key government witness who very well may have had some underlying deficiencies. To be sure, the circumstances of *Edwards* are not identical to those present here.  However, they do underscore the importance of identity.

Given the importance of identification, the Government's complete failure to adduce any direct evidence as to Haddow's identity, after calling thirteen witnesses to testify, confounds the Court. While the identity of a witness is significant, the identity of a defendant is the *sine qua non* of a criminal prosecution.

The Court hastens to remind the Government that the burden of proof in all criminal cases is on the Government. *See In re Winship*, 397 U.S. 358, 361-62 (1970). The Government is constitutionally mandated to prove, beyond a reasonable doubt, each of the elements of the alleged crime. *See id*. This constitutional protection is guaranteed to all citizens, and is something that the Court takes very seriously.  It is troubling that the Government was apparently not so concerned in this instance.